May it please the court, William Piper appearing on behalf of the appellant Victor Davis. I would reserve two minutes for rebuttal. This is an appeal of the District Court's dismissal of Mr. Davis's racial harassment, race discrimination, and retaliatory termination claims. As regards the racial harassment claim, the District Court ruled that a jury could believe that Mr. Davis was subjected to a racially hostile work environment, which I agree with and I think that's an understatement given the facts, but it also ruled that the defendant had no reasons to know about the racial harassment and that it promptly investigated Mr. Davis's complaints and those conclusions are contrary to the record. In this case, Mr. Davis complained about racial slurs in the background, but the defendant did not at all investigate the racial slurs. When I asked Mr. Ackley, the Human Resources Director, if he had asked any questions about the racial slurs, he spoke to 14 people. He said he did not and I asked him why not and he indicated something to the effect of, well the question didn't occur to me. Now why didn't it occur to him? The defendant was advised under the circumstances to investigate Mr. Davis's racial slurs complaint, yet he didn't do that at all. When did he first report these incidents to Mr. Ackley? Well, as you know, there were the three physical incidents that occurred, the banana... Was it before or after that that he reported? It was afterwards. I believe it was August 27th and 28th, somewhere around there, that he reported on both dates the three incidents, the banana and the t-shirt with Mr. Davis's name on it that showed it mockingly and said, you know, I love bananas or whatever. But those incidents actually had occurred before the first tripartite meeting, right, where he told Ackley about these other things? Well, he told, it's Ackley and Rackley that's kind of confusing. Rackley's the one who made all the nigger comments. Ackley, Ackley and Rackley. Correct. Two Ackleys, one Rackley. But Mr. Davis complained about the three incidents on the 27th and 28th. Then on September 10th, he also complained about the racial slurs and the defendant's attorney advised the defendant to investigate the complaint about the racial slurs and they didn't investigate it at all, Mr. Ackley admits. He asked no questions about that. So the district court's conclusion that the defendant had no reason to know about it and that it improperly investigated Mr. Davis's complaints are not true as regards to the racial slurs because they had a reason to know about, they were informed of a complaint, they were told to investigate the complaint and they didn't do it and obviously they didn't investigate the complaint. So, I mean, it's not like they should know, there wasn't other reasons for them not to know about it either. Phil Garcia, prior to this, had complained about racial slurs within this modular cell which included 10 to 12 people and based on my questions of people in depositions, at least seven of the people in that particular cell were calling Mr. Davis a nigger. When was it that, didn't the company take some kind of Yes, your honor, they took some of their bonuses or something. Yeah, they took disciplinary action, they gave warnings and a bonus, they affected their bonus of three people that were involved in the physical incidents. Had they investigated the racial slurs incidents, obviously a lot more people would have been implicated including Rackley whose, you know, conduct with respect to Mr. Davis was outrageous. Is it true that when Phillips and Ackley asked Davis on August 29th what Davis wanted them to investigate, Davis only mentioned the three issues, the three incidents? At that point, he only mentioned the three incidents. It was on September. That's my question. I was saying when Phillips and Ackley asked him what he wanted them to investigate, he only mentioned those three incidents. At that time. That's after he made the statement that you're relying on, right? I'm not sure I understand what you're saying. You said there were, originally they, there are these three incidents that were reported and then later they were reported in a way that included also this reference to racial statements? Correct. On September 10th, Mr. Davis complained about racial slurs. After that, yeah, yeah, after that, August 27th to 28th, the initial complaints and then on September 10th, he advised about the racial slurs. You're talking about the September 10th not being investigated. Correct. And then they were advised by the corporate attorney to investigate the racial slurs and it never happened. So, you know, the hostile environment wasn't investigated. And for that reason, the defendant's liable. The court just misinterpreted the record by saying the defendant had no reason to know about it. Well, there was a complaint about it and they didn't investigate it. Had they investigated it, the evidence should have come out as it came out in the deposition. Were there any employees after that though? I believe they interviewed 14 employees. Yeah, there were quite a few employees who were investigated, about whom questions were asked. My concern is that they just didn't ask about the general racial noise that was going on. Correct. Had they investigated. They should have had a focused investigation on the things where they had names. Right. You know, from my perspective, they deliberately limited the investigation. I mean, if they got those names from your clients, and there's no indication that during the time when all these additional things were occurring, that they were advised of them. I mean, even by your own admission, the employer didn't know of anything racial until September 10, which was a week before your client's termination. And by that time, they had acted and taken pretty serious disciplinary action against the named employees. Well, I don't exactly remember when the disciplinary action occurred. I don't think it occurred until after everything was over with. And the complaint was made on September 10. My client wasn't terminated until the 17th. So there's things still going on there. And they just totally ignored the complaint about the racial slurs, even though they were advised to investigate it. That's the point. What they were told was there was background noise. Correct. He thought he heard racial slurs in the background. Correct. So what should you... How are you supposed to investigate anything that indefinite? You ask people, have you ever heard any racial slurs? Have you ever made any racial slurs? That would be very, very easy under the circumstances. It's just the way I did in the depositions, and it all came out about Rackley calling Mr. Davis a nigger, a porch monkey, all that stuff came out. That's a very, very easy question to ask. So to focus it, when you have this additional complaint, on only these three incidents, you're told to investigate the racial slurs, and you don't do it, that's a problem. You know, the rules about employer liability contemplate that during the time frame the hostile environment is in existence. The employee who is affected by it should advise them during that time period so the employer's investigation can do something to stop or change the environment. That really doesn't fit our fact pattern. Well, I think it does. Mr. Davis eventually... Probably Mr. Davis, I don't know, it's not in the record, but probably thought if he complained about these three incidents, it would all come out. However, he did complain later, on September 10th, about the racial slurs, and they never investigated it. That's not prompt and appropriate remedial measures. That's just baring your head, eliminating it, and focusing on what you want to focus on. I have to emphasize, they were told to investigate the racial slurs, and they didn't. I think that's very, very clear. The court was wrong in its conclusions that they didn't have a reason to know about it. What about what your client said to them would indicate to them that the racial slurs came from particular sources or anyone other than the individuals who were identified and later disciplined? My client indicated he heard racial slurs in the background. At that point, that should have obligated them, especially given their attorney told them to investigate it, to investigate whether people were using racial slurs. Did he identify who the people were making these racial slurs? He did not. At the time of the attempt, he just said, I heard background. I mean, you know, most of the time people don't come up to people and call someone a nigger. It actually sounds like what you're now alleging is very specific conduct involving some of the same individuals who were investigated and who were disciplined. Well, some of them. Some of them are not. Rackley was never mentioned regarding the three incidents. He wasn't disciplined at all for any of this stuff. The three people obviously suffered less severe discipline than Mr. Davis did because Davis was fired and for reasons I believe are protectional. I haven't even gotten to that issue yet. And these three people were not. So regarding the pretext issue, you know, one way of establishing pretext is that the claims are false. They're false on two grounds. He was accused of going and closing out his time. In other words, entering false time. Mr. Davis denied doing that. We have an affidavit from another employee who indicated that Rackley admitted that he falsified Mr. Davis's time cards. Mr. Davis complained at the time these accusations came up against him that, look, these people are falsifying my time cards. And yet they didn't investigate that either. When I asked Mr. Rackley why didn't he investigate that, his response was, I don't know. The other issue that they're claiming against Mr. Davis is that he threatens some people. Mr. Davis denied threatening people. And a threat, I guess, is characterized as he told people not to talk. Well, I don't know how that's a threat. Everyone who, no one was dissuaded not to talk. So even if what the defendant is saying Mr. Davis did is true, he didn't threaten anyone. At most he said, this is according to the defendant's version of facts and not ours, which Mr. Davis says he denied saying anything like that. But no one was dissuaded from talking, and a statement, don't talk, is not a threat. It would be a threat as I'm going to kick your butt or something if you talk, but that's not what happened here. So that's not true. And then you get to the disparate treatment. And obviously, I mentioned that earlier, Mr. Davis was fired for reasons I don't think had any basis. And yet these people engaging in severe racial harassment at the workplace are not fired. Some of them are disciplined. Some of the others receive no disciplinary action whatsoever. The court also erred by not considering statistical evidence, both as regards to prima facie case and as regards the pretext issue. The Sixth Circuit and the U.S. Supreme Court have said that statistics can be used to establish a prima facie case and to establish pretext. And as regards race discrimination, we're running out of time, but the court only went so far as the prima facie case. And there's plenty of evidence to show that he had a prima facie case and pretext as regards his race discrimination and retaliation claim. So I didn't address the limitations argument. I think that's an interesting argument. The most significant point I think the defendant made about that is I didn't raise at the trial court level. However, and I acknowledge that. That's something that popped into my head later. Thurman says – I think your time is up. Thank you. Good morning. May it please the court. My name is Craig Lubin, and I represent Landscape Forms. Let me go directly to the respondeat superior argument on harassment. In other words, the argument that the employer should have been on notice. Here are the facts. They're undisputed and they're clear on the record. The plaintiff, Mr. Davis, had been confronted a few days earlier that his co-workers were complaining about the fact that he was frequently missing from his cell. On the morning of August 28, one of the co-workers approached one of the leaders and said, We can't find him. Can we text him? He said, No, I'll find him for you. Shortly after that comes the complaint. And Mr. Davis comes forward to Human Resources and he says, I think someone's trying to get me fired. And the reason I think somebody's trying to get me fired is because, number one, someone texted my girlfriend and said that I wasn't at my site. Number two, someone entered time on Saturday when I didn't work, and I think somebody did that for me. And number three, Mr. Quick, my cell leader, told me earlier this morning that my co-workers were looking for me, but when I went back to my cell, which is where they worked, they weren't looking for me. So what Mr. Ackley, Jim Ackley, and Karen Phillips from Human Resources, both from Human Resources, did was they wrote all these complaints down, reviewed them with Mr. Davis to confirm that this is what he wanted investigated, and they did investigate. What they learned was, with regard to the texting incident, it was, in fact, a situation where he was missing from his cell. They thought that he had his cell phone number, so Cornelius Van Wezema texted him. Turns out he had given his cell phone to his girlfriend, so they reached the wrong person. He then called Mr. Van Wezema and said, why did you call my girlfriend? He explained at the time he apologized, and that was the end of the incident. That had occurred several weeks before. In reporting the incident, Mr. Davis didn't mention the context with Mr. Van Wezema. The second thing that they found when they investigated was that, in fact, with regard to the time entry, there was time entered for both the Saturday where he didn't work, but also Tuesday where he had been off work, and there was only one time entry. That's all they knew at that point. The third thing that they learned when they investigated, and this was with regard to calling him and asking that he be back to the cell, was that his colleagues said he was always missing from his cell, and, in fact, they told an anecdotal story where he would make fun of it to the point that he took a picture of himself in the bathroom and posted it on Facebook when he's supposed to be working. So they learned this information, and they confront him with it on September 10. I think sensing that it wasn't going well, he then reported three incidents that we would call racial incidents. One was that somebody had put a banana in his work boot several months before when he had been off at a funeral leave. Second, that someone had put yellow tape on his welding helmet and had written the words Chiquita and Ghetto Fab on it. And third, that on the day he was put on, I skipped part, after they were investigating his initial complaints, some people came forward and said Mr. Davis is saying we shouldn't cooperate and were frightened. So they put him on a paid suspension while they completed the investigation. When he went off on his suspension, apparently some, well, we know who, somebody wrote on the whiteboard a monkey sign and said I like bananas. Someone else reported to Mr. Davis that this had occurred. And then finally what he said, and this was tab 9 to our brief, docket number 39-9, page ID 181. This is what he reported. Regarding racial comments, Victor said he can't point a finger at anyone specific that made the comments. He thought he heard it in the background. So then we come to his, we get a lawsuit, we come to his deposition. And I ask him, this is tab 1 to our brief, it's page ID 129, docket 39-1. I ask him the question, regarding the racial comments, talking about the time he made the complaint, you couldn't point a finger at anyone specific that made the comments but you thought you heard it in the background. Answer, correct. And which comments were those? Those were the ones about what I heard from Ryan, the ones I was telling you about. Now, I said, now here you said you couldn't point the finger at anyone specific, but now you're saying it's Ryan. How is it that you're able to tell it was Ryan? And he said, well, after all this was done and over with and I sat down and stopped to think about it, it's a lot going around me and after all this was done and over with, I was fired and I sit back and I contemplate on everything that happened to me and I went through it all and then it all made sense to me, it was coming from Ryan. Okay, so at the time they asked you, you simply didn't remember that. Answer, no. The point is an employer cannot investigate a complaint where you don't have facts to investigate. With regard to the specific complaints, they investigated every one of them. They learned, in fact, that it was... Counsel says you can, so now we get to the difference. Well... They say if there's allegations of racial murmuring, you have to go out there and check it out. And there's ways to check it out even if you don't know who might have been murmuring. Well... So that's the difference between the two of you. How do you address that? I'd address it this way. First, they did interview, I think it was either 10 or 14 employees in the second investigation, talking very specifically about racial allegations, including the specific ones that were raised. Did they specifically ask the question, well, did you hear anybody use a racial comment in the background around Victor? No, they didn't. But they did ask, and it's all in the notes, tell me about this, this is the allegation, what is the response, and what they... Answer those three incidents. Yes, correct. Actually, even... It was actually broader than that. If you look at Exhibit 9 to our brief, these are the pages of notes that Ms. Phillips took during the interview process, and then there's additional notes that Mr. Ackley took. And what they did was they met with each of these individuals, actually obtained written statements from the individuals that was signed. This is actually Tab 10 to our brief. It's docket 3910. It's pages 186 to 195. And you can see in those notes the various things that were discussed with each of those people. The notes, as it relates to Cornelius Van Weesema, start at page 190. And there's a question. Well, here's the question. This is Mr. Ackley's notes. I asked if there was anything else I should know about or that might pertain to this, and he mentioned several other things. And Mr. Van Weesema then complains about Victor Davis. On page 191, again, docket number 3910, page ID number 191, these are the summary of the notes of the interview with Ryan Rackley. About the middle of the page, there's the question, I asked Ryan if there was anything else going on that I needed to be aware of. He had asked on August 28th to speak with me with Matt Ernstberger and Aaron Klock regarding some issues, and then they list a number of complaints about Mr. Davis. My point is, other than asking is there anything else going on, I think that is a generic way of asking what else is going on. I suppose you could say, well, I wish you had done it better. I wish you had said specifically, is anybody using racial comments in the background? But I think the standard for employer liability is, was there willful indifference? Clearly not. There's a significant investigation. Or were they negligent? And I submit by interviewing these people as they did and asking, as they say, a long host of questions, not just the three issues, and then asking is there anything else we need to know about, that satisfies the standard, and that's why we think the court was correct in saying there was no liability. I see your position on that. Could you address the retaliation? It does seem like seven days after the complaint, he's fired. It looks suspicious. And, frankly, the district court said, as it relates to making a prima facie case, we're going to say that the temporal relationship, the short period of time, is sufficient. So the burden shifts back to the employer to show its legitimate non-discriminatory reason for the termination. And you saw that in the notice. And then the question becomes, is there pretext? And on the issue of pretext, the issues that the employer identified in the notice of termination, frankly, most of them were admitted to by Mr. Davis. A few that he challenged, but not many. More specifically, there is no question that he talked to his coworkers about their cooperation in the investigation. There's some dispute about the words that he used, but even he says he told them, best not be involved because it's not good for you. And he's saying, well, what I meant was if you lied, that wouldn't be good. But that's certainly not how they interpreted it. And from the employer's perspective, they had talked with these employees. They had signed statements that are part of the record here that indicated the employees felt intimidated. Regarding the falsification of the time record, here's what they knew. He said he thought somebody entered the record. So they talked with the IT person, and they determined that there was only one entry on his record on Monday morning at 544 a.m., and that was the entry where these times was put in for Saturday and where the time was changed, or where there was time entered for the Tuesday. He didn't work. Was there a dispute as to whether he was actually in during that hour? No, that's the point. That's what led to the conclusion he did it because in the second interview on September 10, Mr. Ackley specifically asked him, explain to me how you entered your time that week. And he said, I came in early. Shift started at 6 a.m. He said, I came in early before my shift, and that's when I entered the time for the previous week, and I logged it out and closed it out. But I didn't enter any new time. That's what happened. The problem with that explanation was we now had admission that he was in the record that morning. The technology person looked at it and showed there was only one person who entered his record that Monday morning at 544 a.m. So his explanation that somebody else must have done it was contradicted by the technology because if someone else had entered the record as well, you would have seen a second entry. There's no question about the fact that he falsified a time record, right? That was our conclusion. He has maintained adamantly that he didn't, but in terms of why did the employer think he did? Because the entry that was false was made on Monday morning at 544 a.m. He admits that he made an entry at Monday morning, and there were no other entries shown in the record at any other time Monday morning until after the start of the shift. So that was the employer's conclusion for saying what he's saying doesn't make sense because he's admitted he entered the record and there was only one entry, and that's when the time was entered. So that was what led to that conclusion. What about comparing that kind of misfeasance or malfeasance to the kinds of things in the alleged comparators which did not result in termination? Sure. Well, the three that we are talking about are Adam Reed, and Adam Reed is the one who admitted he put the banana in the shoe. First key point, he admitted it. He didn't dispute it. He also said that he had told Mr. Davis this months before when it happened. What about Rackley? Okay. Ryan Rackley, there was no complaint about Ryan Rackley at any point by Mr. Davis. There was not a complaint about Ryan Rackley on August 28. These various racial incidents, they involved Adam Reed, Justin Marsh, and Josh Tiller, all who were disciplined. There was no complaint about Ryan Rackley. That is what's so frustrating to the employer. There is no dispute that this employer has an anti-harassment policy. Mr. Davis admits he went through the training for the policy that specifically said, if someone is treating you, harassing you, you are to complain, and we will investigate and take action. Despite that, he never mentions Ryan Rackley at any time until after this lawsuit is filed. The only comment with regard to racial comments, he did not mention Ryan Rackley. And as I say, that's what's so frustrating to the employer. After the lawsuit's filed, he says, Ryan Rackley made 30 or 40 racial slurs throughout my employment, but he never mentions a one, and the specific time on September 10, when he does complain about racial comments, it's, I think I heard something in the background, I can't identify anybody specifically. Well, again, I've explained how we tried to investigate that, but if the claim is, Ryan Rackley has made racial slurs this many times to me, that's what he should have said, and then that would have been investigated, and I can assure you he would have been terminated, because later on when there was a different matter long after the fact and something happened, he was investigated and he was terminated, but there was no complaint about Ryan Rackley at the time. Did he ever explain why it all of a sudden came to him that Rackley was the one who made all these statements? The only explanation that he gave was the one I read to you, where he kind of just thought about it after the lawsuit, and suddenly it dawned on him that it was Ryan Rackley. Ryan Rackley, by the way, denies that he, because he made the point, well, Rackley admitted that, or someone said Rackley admitted to changing the time card at his deposition, Rackley said, I did not do any input at the time, I didn't do it. So you've got, again, conflicting things. The one thing the employer had when it looked at the time card was the admission of him that he had entered time on Monday before his shift started, and the fact that the record showed there was only one entry, and that was at 544. Thank you. Mr. Piper, you had two minutes, I think. The appellee is asking you to take at face value the idea that Mr. Davis said to them that I went in, I entered my time records, and I closed it out. Mr. Davis denied telling Mr. Rackley that, so we have a question of fact. Rackley, excuse me, I'm doing it now. Rackley said, you did say that. They're saying you have to take that at face value. Mr. Davis says, no, I never said that. In addition, Mr. Davis is saying, I told you from the very beginning that people fraudulently placed that time in. I mean, this is time on a day that no one worked. It would be incredibly stupid for Mr. Davis to enter time that no one worked. I mean, it would be easily discoverable. So Davis is saying, I never said that I went in, entered my time, and closed it out to you. He said that in his deposition. He said that in his affidavit. They're saying, yeah, you did say that. Now, that's a question of fact. From my perspective, you can't have an honest belief in your own lie. So that is pretext. That's a question of fact regarding the issue of pretext. There's also a question of fact regarding the other grounds that they claimed they terminated him for at the time they terminated him, which was this threat. And there was no threat. Even if you take the defendant's version, he said, don't talk to them. That's not a threat. All the people talked to them. There's no threat. So there's clearly a pretext here. I'm glad I'm not on parole or something. He denies saying that. That came in from one guy, one of the guys who made racial statements about Mr. Davis. Mr. Davis never said that. If he had, that would have been a threat. Well, implicitly, I suppose you could say. But that's a definite outlier. It came from one guy from our perspective of a lie. You just have to have one person to say it, right? Well, it doesn't make it believable. Mr. Davis denied making any sort of threatening statements, much less that statement. So there's plenty of evidence of pretext here. Thank you both very much for your argument, and we'll consider the case carefully. I assume there were no further questions.  Thank you, Your Honor.